## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

FILED BY_____ D.C.

JAN 2 8 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

CARL CESAREO
    Plaintiffs,

v.                                                    Complaint

TOWN OF CORTLANDT                    42 U.S.C. §1983
SUPERVISOR LINDA D. PUGLISI
CHRIS KEHOE, AICP
    Defendants,

_____

## FACTUAL ALLEGATIONS I

Plaintiff Carl Cesareo formerly resided at Lot number 18 Verplank, New York, 10956 for sixteen years and for sixteen years' plaintiff received correspondence form Chris Kehoe and Linda Puglisi advising him that by 2016 he had to move. Plaintiff did not want to move. After Hurricane Sandy in 2012 plaintiff rebuilt his home and replaced the furnace. Finally, out of fear of losing everything and the stress caused by the defendant's harassment plaintiff accepted $3,000 from defendant in February 2016 and moved. On February 24,2016, while looking for a hotel in Florida plaintiff was so ill that upon his arrival in Florida, he was immediately hospitalized at 12:00pm because his oxygen count was zero. Because the details of the entire circumstances are too painful, I cannot even speak of it, the memories are crushing and traumatic, and no words can describe my physical and mental suffrage and I do not want to relive the ordeal.

At my age being forced to relocate after being harassed for sixteen years, with in that timeframe the least the defendants could have done was follow New York Condemnation Law. I could have accepted a negative court decision, but this was unacceptable. To be denied due process was a fate worse than death for some of my friends who didn't survive the stress from the harassment inflicted by the defendants.

    I was denied due process and my rights are protected by state law, federal law and the U.S. Constitution – specifically, the Fifth Amendment.

    The Town of Cortlandt failed to comply with the requisite "two-step process" for any such condemnation set out in the New York Eminent Domain Procedure Law. Wherefore, I require assistance in obtaining my entitled expense reimbursements – State laws across the country

1

provide opportunities for landowners to recover some or all of their <u>attorneys' fees, relocation</u> costs, appraisal or survey fees and other expenses incurred as a result of the government's exercise of eminent domain.

## THE PROPERTY OWNERSHIP FAIRNESS ACT II

This Act prevents such an unjust outcome by defining "just compensation" as "the sum of money that is equal to the reduction in fair market value." Thus, if a regulation deprives an owner of 10 percent of the property's value, the owner must be paid for that 10 percent loss. The Act makes no exception in terms of time, and because it provides the government with an opportunity to waive the restriction, the possibility that owners might lose their property to "temporary" prohibitions is reduced.

PPRPA Overview

- Restricts government's use of eminent domain to instances where (1) the use of eminent domain is authorized by state law, (2) the condemnation is necessary to that use, and (3) the use is truly public (as defined by the Act).
- Puts burden on government to prove blight by real evidence and requires courts to make a genuine decision on that question instead of deferring to the government.
- Requires government to buy the owner a comparable home if it takes a home for slum clearance or redevelopment.
- Requires government to pay owners when regulations that do not genuinely protect public health and safety take away property rights and reduce the value of their land.
- Institutes a swift, simple claim process that allows regulatory takings claims to be resolved without the need for attorneys or lawsuits.
- Requires government to pay owners' attorney fees and court costs when they successfully challenge the misuse of eminent domain or regulation.
- Prohibits government from assessing attorney fees and costs against property owners.

## LEGAL STANDARD III

As the owner of a private property, the rights of plaintiffs are protected by state law, federal law and the U.S. Constitution – specifically, the Fifth Amendment.

Private property owners' rights include the following:

2

According to the law when a "corporation is unable to agree for the purchase of any real property required for the [construction of a pipeline], it shall have the right to acquire title thereto by condemnation" (Transportation Corporations Law § 83; see generally Iroquois Gas Corp. v Jurek, 30 AD2d 83, 84-89 [4th Dept 1968]).1  A "two-step process" for any such condemnation is set out in the Eminent Domain Procedure Law (Matter of City of New York [Grand Lafayette Props. LLC], 6 NY3d 540, 543 [2006]).

"First, under EDPL article 2, the condemnor must make a determination to condemn the property either by using the hearing and findings procedures of EDPL 203 and 204 or by following an alternative procedure permitted by EDPL 206" (id.). "Second, pursuant to EDPL article 4, the condemnor must seek the transfer of title to the property by commencing a judicial proceeding known as a vesting proceeding" (id.).  When a condemnor invokes an alternative procedure authorized by EDPL 206 (i.e., an exemption from the standard condemnation procedure of EDPL 203 and 204), the Essentially, a New York entity wishing to acquire property for "public use" must approach the EDPL public hearing seriously. It must make a record supporting a rational basis for the taking and one for each issue contemplated by article 2 of the EDPL.

Condemnee may obtain judicial review of the condemnor's entitlement to an EDPL 206 exemption by raising the issue in its answer to the condemnor's EDPL article 4 vesting petition (see Matter of Rockland County Sewer Dist. No. 1 v J. & J. Dodge, 213 AD2d 409, 410 [2d Dept 1995]; Matter of Town of Coxsackie v Dernier, 105 AD2d 966, 966-967 [3d Dept 1984]; see e.g. Matter of Eagle Cr. Land Resources, LLC v Woodstone Lake Dev., LLC, 108 AD3d 71, 74-78 [3d Dept 2013]; Matter of Sanitation Garage Brooklyn Dists. 3 & 3A, 32 AD3d 1031, 1034-1035 [2d Dept 2006], lv denied 7 NY3d 921 [2006]).

"The main purpose of article 2 of the EDPL" – the first step of the eminent domain process – "is to ensure that an appropriate public purpose underlies any condemnation" (City of New York, 6 NY3d at 546; see EDPL 204 [B] [enumerating factors relevant to the public purpose inquiry]). The alternative procedures permitted by EDPL 206 are not designed to obviate the condemnor's obligation to demonstrate that the condemned land will be put to public use.  Nor could they, for the existence of a "public use" for condemned property is indispensable to any constitutional exercise of the eminent domain power (NY Const, art I, § 7 [a]; see generally Matter of Goldstein v New York State Urban Dev. Corp., 13 NY3d 511, 546-552 [2009, Smith, J., dissenting] [discussing background and history of the "public use" requirement in the State Constitution's

eminent domain clause]). Rather, the alternative procedures permitted by EDPL 206 simply allow the condemnor to make its public purpose showing in a different forum.

## ANALYSIS IV

**The Legal Standard for Condemnation and Plaintiffs Rights After Receiving a Condemnation Notice**

**Public purpose** – The Fifth Amendment requires that the government only condemn private property for a public purpose. While "public purpose" is not clearly defined, there are some guidelines outlining reasons the government can – and can't – take private property.

**Due process** – Under the Fifth and Fourteenth Amendments, all citizens are entitled to due process of law, before the government can take their property. With respect to eminent domain, landowners are entitled to notice of and to be heard before the government can deprive them of their property. The notice must provide reasonable information that would provide affected landowners and other interested parties adequate time and opportunity to respond.

**Just compensation** – The Fifth Amendment also requires the condemning authority to pay **just compensation** for property taken using the power of eminent domain. The requirement that landowners receive just compensation for property acquired by eminent domain provides the owner a financial payment in exchange for the loss of his or her property to the use of the public. When a portion of a property is taken, the owner may be entitled to compensation for the value of the part taken as well as any damages to remaining property.

**Expense reimbursements** – State laws across the country provide opportunities for landowners to recover some or all of their **attorneys' fees**, **relocation** costs, appraisal or survey fees and other expenses incurred as a result of the government's exercise of eminent domain.

**Dispute** – Perhaps most importantly, if the government attempts to condemn your property, you have the right to consult with an attorney and to fight back. An experienced eminent domain lawyer will be able to help you identify all possible grounds to **challenge the government**'s exercise of eminent domain, will assist you in obtaining just compensation for your property and will help you navigate the complex procedures and deadlines of eminent domain litigation.

**How the Government Takes Private Property**

As the government makes its plans for expansion and improvement of publicly maintained roads and utilities, it determines which private parcels will be affected. Once it makes that determination, the government will work with its own appraisers to determine the appropriate price for the

necessary property interests. When the government has established its estimation of the property value, it may <u>offer the landowner a particular price for the property</u>. If the property owner agrees, the government buys the land. If the property owner disputes the government's valuation and they cannot agree on a price, the matter will go to condemnation proceedings. During condemnation proceedings, the property owner will get to offer his or her own valuation for the property. Typically, the property owner will work with an attorney and an appraiser. The attorney will protect the property owner's legal rights respecting the involved property, and the appraiser will work to establish the property's fair market value. The property owner may also oppose a forced sale by <u>contesting the government's proposed use</u> of the property. As long as the use is proper, however, this type of challenge will fail. As an alternative, the landowner may also claim that the extent of the property the government is attempting to condemn is too great and that its purposes can be fulfilled with less intrusion. Generally speaking, the government is only allowed to invade the property rights of individuals to the extent necessary to accomplish the intended public purpose.

**Value of the Property**

Most <u>condemnation proceedings</u> turn on the value of the property at issue. How much a piece of property (or an interest in property) is worth depends on many factors. For a piece of undeveloped land with a single owner and no exceptional or unusual features, establishing the property's value may be fairly straightforward. The zoning of the property and the value of surrounding tracts will provide useful guidance for the calculation. In urban settings, however, the property is likely to be developed. In this case, the current use of the property, the structures upon it, access to the property, the interests of any lessees, and many other issues will complicate the value determination. The many unique characteristics of the property often result in a different estimation of value between the property owner and the government. In addition to an appraiser and an attorney, each side may have additional experts, such as engineers and architects. Factors that are considered in property valuation include: its size, how it is zoned, what kinds of buildings and roads are on it, what it's currently being used for, what it could be used for, how accessible it is, what other businesses or land uses are adjacent or nearby, and whether there are tenants or other leaseholders involved. The property may represent the owner's livelihood, so that to the owner it is worth everything he or she has invested in it, and all that can be derived from it. To the government, however, the relevant value is the property's market value -- what an interested buyer who is not obligated to buy might

pay to an interested seller who is not obligated to sell. The valuation is also made as of a particular date. This is because property values can fluctuate over time. To arrive at one price, the determination is established as of one date. The <u>value determination</u> also turns on the amount of the acquisition. In some instances, the government may need to take all of the owner's property. In other cases, the government's acquisition will be more limited. The government may need to acquire only a part of the property, or just an easement over it. The value of these interests depends on the land involved, and on the effect the loss or intrusion of that land will have on the rest of the property.

## Valuation Methods

In determining the value for a particular piece of property, appraisers and courts generally recognize three approaches: the market approach, the cost approach, and the income approach. Under the market approach, the value for the subject property is established based on recent sales of comparable, nearby properties. Based on these sales, the appraiser forms an opinion as to the price the subject property would bring on the open market. The market approach may be inappropriate if there have been no recent comparable sales in the area. The cost approach (sometimes called depreciated replacement cost) looks at how much it would cost to replace the land and existing structures, after factoring in depreciation. The income approach considers the investment value of the property -- that is, how much one would pay at the moment of valuation in light of the property's income potential.

## Time of Valuation

Another point a property owner may contest is the time of valuation. This can happen when the government unreasonably delays its acquisition of the subject property at the same time its actions substantially diminish the subject property's value. For example, the government cannot buy up and condemn adjacent properties, destroy them or let them decay, and then lowball the remaining property owner once his or her own property value has fallen as a result. Such a case is an exception to the general rule that the government does not have to compensate a property owner until it has taken his property or substantially impaired his ability to use it. The government may argue that it has not done so, but the property owner will argue that the government's actions have made his or her property all but useless in the real estate market. Condemnation proceedings derive from the simple principle that the government may secure private property to benefit the public. Yet, because of the multitude of uses to which the property may be put, and the many factors that can

influence the real estate market, condemnation proceedings can be quite complex. The valuation figure that the government reaches may differ from the landowner's, at which point the measurement of value will turn on the persuasiveness of the landowner's appraiser. What's more, the property owner's appraisal must meet specific legal requirements. Fair value will be based on the extent of the property taken and an analysis of the many interests involved. In a September 30, 2011 decision, the Appellate Division Fourth Department held that a Petitioner in a proceeding under Article 2 of the Eminent Domain Procedure Law timely challenged the Respondent agency's environmental determination despite the fact that more than four months had passed since the agency issued its negative declaration for the project under the State Environmental Quality Review Act ("SEQRA"). In *H.H. Warner, LLC v. Rochester Genesee Regional Transportation Authority*, Petitioner H.H. Warner commenced a proceeding under Article 2 of the Eminent Domain Procedure Law challenging RGRTA's Determination and Findings to condemn Petitioner's property for its proposed Renaissance Square Transit Center. H.H. Warner brought its challenge on the grounds that RGRTA failed to comply with SEQRA. As set forth by the Court of Appeals in *Stop-the-Barge v. Cahill*, 1 N.Y.3d 218 (2003), the general rule is that the filing of a negative declaration by a lead agency constitutes a final determination by the agency and starts the limitations period for commencing a SEQRA challenge. Under Article 78 of the CPLR, a proceeding to challenge an agency's final determination must be commenced within four months of such determination. However, EDPL §207, as amended in 1991, allows a Petitioner in an eminent domain proceeding to challenge whether a condemnor's determination and findings were made in accordance with both EDPL Article 2 and Article 8 of the Environmental Conservation Law, commonly known as SEQRA. In this case, RGRTA issued its negative declaration on June 8, 2010 but did not issue its Determination and Findings under EDPL Article 2 until May 12, 2011. Within the 30-day period required by EDPL §207(A), on June 10, 2011, H.H. Warner filed its petition seeking review and rejection of RGRTA's Determination and Findings on the grounds that RGRTA failed to comply with SEQRA. RGRTA unsuccessfully argued that H.H. Warner's June 2011 challenge was untimely because the 1991 EDPL amendment was merely technical in nature and, under CPLR article 78, any challenge to SEQRA should have been commenced within four months of its June 8, 2010 negative declaration. In a holding separate from its decision on the merits of the EDPL challenge, the Court rejected RGRTA's contention that Petitioner's challenge to its SEQRA determination was untimely. The Court agreed with H.H. Warner's position that

7

EDPL § 207(C)(3) was amended in 1991 explicitly to allow courts to review a SEQRA determination at the same time a proceeding is brought challenging a determination to condemn property. Acknowledging that the 1991 EDPL amendment was intended to permit a reviewing Court to pass on both the EDPL issues and the SEQRA issues in one proceeding, thereby facilitating prompt review and conserving judicial resources, the Appellate Court concluded that "the statute does not require that a separate CPLR article 78 proceeding must have been commenced in order to challenge an earlier SEQRA determination."

## FOURTH AMENDMENT VIOLATION V

### Municipality's Policy or Custom

No person acting under color of law, including municipalities and local governments, may violate an individual's constitutional rights. *42 U.S.C. § 1983 (1996); Monell v. Dept. of Soc. Servs. of City of New York, 436 U.S. 658, 690 (1978)*. A municipality cannot be held liable under the theory of respondeat superior—the doctrine that holds an employer responsible for an employee's wrongful acts committed within the scope of employment. *Monell, 436 U.S. at 691; Black's Law Dictionary 1505 (10th ed. 2014)*. Instead, a Section 1983 plaintiff must allege the local government has an official policy or custom that led to a violation of the plaintiff's federal rights. *Monell, 435 U.S. at 694–95*.

Naked assertions that a municipality or county has a policy or custom are insufficient to state a plausible claim for relief under Section 1983. See *Weiland v. Palm Beach Cty. Sheriff's Office, 792 F.3d 1313, 1329–30 (11th Cir. 2015)* (citations omitted) (holding a single incident by two deputies failed to sufficiently allege a policy or custom under Section 1983); see also *City of Oklahoma City v. Tuttle, 471 U.S. 808, 823–24 (1985)* (plurality) (holding one incident cannot impose liability against a municipality when the city's policy is itself constitutional).

Plaintiff alleges that the Town has had a "custom or policy of harassment against them personally." (Exhibit A-B-C). Plaintiffs allege that this policy or custom of harassment has violated their Fourth Amendment protections against unreasonable seizures. *Ronald Howarth v. City of New Port Richey Case 18Cv.2134-T-AAS*.

## Legal Sufficiency of Fourth Amendment Claim VI

The Fourth Amendment protects individuals and their property from unreasonable searches and seizures. U.S. Const. amend. IV. Plaintiff asserts that defendants a local government is a "person" subject to suit under Section 1983 of Title 42 of the United States Code: Civil action for deprivation

of rights, have no qualified immunity against Municipal Liability, *Monell v. Department of Social Services, 436 U.S. 658 (1978. McMillian v. Monroe County*, 520 U.S. 781 (1997), <u>*Connick v. Thompson*</u>, 563 U.S. 51 (2011), *L.A. County v. Humphries*, 562 U.S. 29 (2010), *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989), *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989), *Springfield v. Kibbe*, 480 U.S. 257 (1987), *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985), *Brandon v. Holt*, 469 U.S. 464 (1985), *Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981), <u>*Owen v. Independence*</u>, 445 U.S. 622 (1980), *Quern v. Jordan*, 440 U.S. 332 (1979), *Hutto v. Finney*, 437 U.S. 678 (1978). Treatises: Rodney A. Smolla, *Deprivation of Rights Under Color of Law: § 1983, Bivens Actions, and Related Issues*, Ewin Chemerinsky, *Federal Jurisdiction* (7th edition 2016) Stuart M. Speiser, Charles F. Krause, Alfred W. Gans, Monique C. M. Leahy Contributing Editor, *American Law of Torts, Strict Liability in Tort and Related Remedies; Intentional Torts*

## Legal Sufficiency of Fifth Amendment Claim VII

Defendants violated the Fifth Amendment by failing to compensate plaintiff for the taking of plaintiff's property. Plaintiff contends that the Town of Cortlandt had no claim of right to threaten, harass, intimidate and to use force to destroy plaintiffs property in violation of his Fourth Amendment rights, see *United States Supreme Court Tennessee v. Garner No. 83-1035 Argued: October 30, 1984Decided: March 27, 1985, United States Supreme Court Graham v Connor (1989) No. 87-6571 Argued: February 21, 1989Decided: May 15, 1989.*

On June 21, 2019, the Supreme Court of the United States decided *Knick v. Township of Scott, Pennsylvania*, No. 17-647, overruling *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), and holding that a government violates the Takings Clause the moment it takes property without compensation, and a property owner may assert a Fifth Amendment claim under 42 U.S.C. § 1983 at that time, without pursuing a state-law remedy first.

Wherefore, Plaintiff prays for just compensation for his property and land and for the return of his land. Plaintiff further prays for past relocation and re-relocation costs and whatever other appropriate order that may be deemed just and proper.

_____  Date:

Carl Cesareo
1208 Lee Street Lot # 8
Leesburg Fl. 34748

HENRY D MORALES
MY COMMISSION # GG030882
EXPIRES September 15, 2020

CARL CESAREO
1208 LEE ST
LOT 8
LEESBURG, FLA
34748



87/R
IN-TAKE
FLOOR
SEATION
USMS INSPECTED

US COURT
400 NORTH MIAMI AVE
MIAMI, FLORIDA
33128



